Good morning, Your Honors. Ms. Huarte, go ahead. Thank you. Good morning, Your Honors. May it please the Court, my name is Anne Huarte, I represent the appellant Joshua Tan. I will attempt to reserve approximately five minutes for rebuttal. In this case, Joshua Tan, a young aircraft engineer for F-15 airplanes, was seriously injured and lost his lower right leg. At summary judgment, the trial court erred in its analysis of duty by usurping the role of the jury and determining multiple genuine disputes of fact on its own and by apportioning fault on its own. However, before discussing key evidence that the court disregarded or impermissibly weighed, the trial court's misunderstanding of the complaint must be addressed because it infringed  The complaint alleges that PKL Services owed Joshua Tan a general duty of reasonable care, including a duty not to subject him to an increased risk of injury, which here meant not to send him to drive the bomb loader, or MJ-1, across the base approximately half a mile. Although the pleading may admittedly be imperfect, the complaint specifically references that PKL should not have directed Tan to drive the unstable MJ-1 a distance farther than he was trained to operate it on an open road at higher speed with lack of training. Can I ask, counsel, just to jump in? I mean, I understand the theory of negligence that you framed in the opening brief. It seems to me it's a little bit different, perhaps, from the one that was litigated below. But I understand it. But it seems to me the key fact that you would need to prove for that theory to work is that the defendant had some knowledge of the limited extent, I guess, of your client's training in operating that machinery such that, I mean, I don't know, you know, he had some training by another entity, he had that certification. And I think you would, your client would need to show that it was, I don't know, somehow foreseeable that they should have known that when entrusted with this machine that he was know how to operate it safely. And I guess I don't see, maybe you can help me understand where the evidence of that key fact is in the record. Certainly, Your Honor. I welcome the opportunity. If I can follow up with Judge Watford's question specifically in terms of that as well, the record reflects that Tan received his Royal Singapore Air Force flight line certification in March of 2018. And he began this weapons load training with PKL in May of 2018. So specific to Judge Watford's question, there's clearly indication that he had received flight lines certification. So in responding to his question, I guess also, what was the flight line certification that he received? Certainly, Your Honor. This was addressed in detail in the reply brief on page 14. I only say that in case you want to look at it further there for specific citations later. What this raises is a triable issue of fact. And the reason that it does is because the court cannot just look at this certification or this card without looking deeper into the other evidence that was presented in opposition to summary judgment and in the record. What was presented was that the training records reveal that the Republic of Singapore Air Force's training, the familiarization training, did not include driving the MJ-1 on a road or at any speed higher than a walking pace. It only included turning on and off the vehicle, lifting and lowering the forks that hold the munitions, and being able to maneuver in a small circle in a very limited area, a 15 meter square, which was further limited by cones. The training records themselves, and that evidence that I just listed was based on Tan's declaration, and it was also based on the training records themselves. The Singapore Air Force competency test has items one through eight, and none of them describe any of the skills that we're talking about that would have been needed for Tan to be competent to drive on the flight line road. And the same record shows other things were missing. There was no training for contingency braking, and also he was limited to only the ramp in his flight line and competency card. Can I jump in? I mean, I think you don't need to prove to us that your client did not have the adequate training. I think that's why this tragic accident occurred. So we kind of take that as a given. I think my question was, what evidence is there in the record that the defendant should have known about the limited extent of your client's training? Thank you. Thank you for turning me to that knowledge. So this also raises a tribal issue of fact, because there was a declaration from PKL's Mr. Helmandaller, in which he stated that the flight line competency card would mean to an instructor that would mean that Tan was competent to drive the MJ-1 across the Air Force base. However, the instructors who were on the ground doing the training, Mr. Wright and Mr. Young, neither of them said he was competent to do that drive. That omission from their declarations and their testimonies is a glaring one. They did not say that. And the reason I listed the prior evidence about needing to have to look behind what certification means exactly is because these are longtime instructors. They've been doing this for five years or more at this specific base, and they know when someone comes to them what experience they have or do not have. They're the experts on this vehicle. They have driven this vehicle for 20, some 30 years in their long time in the military before becoming private government contractor instructors. So because of their expertise, because of their short time observing Tan, and because of what they know, including another point I should raise, Instructor Wright testified that an MJ-1 is never used to obtain the flight line competency card. Servicemen choose pickup trucks to do that. So I believe all this evidence forces this to become a genuine disputed fact. These expert trainers knew that Tan was a novice and knew that a flight line competency card doesn't mean you can drive that particularly vehicle with any competence on a long road. Ms. Warty, if I can, the matter of delegation of presumption of duty, essentially, which is in the question here, there is also an issue of public policy. I think it's the Roland case, the California case that evaluates the matter of that kind of presumption of duty and certain factors here. You, we have a military contract here, correct? This involves a military contract between the United States Air Force and the Royal Singapore Air Force, correct? Yes, the Republic of Singapore Air Force. You've got it exactly right. Yeah. And then with respect to the weapons loading training, the United States Air Force then delegated that to PKL, correct? The private contractor. Yes. Right. And what are the public implications generally in terms of military contracts? There's definitely a public policy, I think, that stands here in terms of counseling against state law interfering with military contracts and has been addressed by the Supreme Court, I think, in the Boyle case, Boyle versus United Technologies back in 1988. What are the public policy considerations with respect to determination of the levels of duty under state law, be it California law, Idaho law, Montana law? Aren't there certain public policy considerations that have to be addressed here? Thank you, Your Honor. One, yes, one of the Roland v. Christian factors for removing a case from the presumption of a duty of care. In California is, well, all of the factors that point to public policy considerations. In the military context, this... If I can, just to help you out a little bit, as I understand it, there are three sources of duty that are at issue here. There's a duty to provide operational training. There's a duty of care owed by the instructors to the trainees. And there's a generalized duty to avoid subjecting the service member to increased risk. That's a general summary of the three sort of issues of dispute here in this case. Isn't that correct? I would agree those are three duties, yes. And then I guess my point is, is that the Roland case does acknowledge and addresses the public policy factors. And it seems to me that the thing that's involved here is you have the U.S. government, the U.S. Air Force contracting with a foreign entity in terms of military training, who is going to do what, who is certified as to what, and getting back to Judge Watford's earlier question, in terms of then having the U.S. government then delegate to a private contractor, and then state law in terms of what the duty is, it gets... There's some real public policy concerns, aren't there, here in terms of having some uniformity of standard and clarification in these military contracts. Isn't that correct? Yes, but the standard of negligence applies under California law to all persons, even government contractors, unless they are subject to derivative sovereign immunity. And the Ninth Circuit has spoken very clearly on that, that the immunity only applies where the government provides specific control and direction about what its contractor is supposed to be doing. Otherwise, general negligence law will apply. Well, apart from the matter of derivative sovereign immunity, and I understand your point on that, it seems to me that in terms of some of the cases you've cited, in terms of the duty formulations, they involve, one of your cases involved law enforcement officers, for example, in terms of California law enforcement officers and the California standards as to law enforcement officers. But here, you're talking about a military contract between the U.S. government and the U.S. military and a foreign government and its military, in terms of what should or should not be anticipated in those specific contracts. It's a little different than the standards applied by California or Idaho or Montana in terms of the obligations of law enforcement officials, it seems. There's a greater universality, I guess I'm trying to get to, in terms of military contracts here. And that's what I would like for you to address, if you can. I'm sorry I took so long with my question. Perhaps Judge Pios will give you more time to respond. But you understand what I'm saying? There's an important public policy involved here. Well, yes, I don't think that they are going to infringe upon one another, however, because it's very important and it's explicitly stated in the U.S. Air Force's contracts with this private contractor, PQL, that safety and carrying out all its duties in a safe manner are of the highest importance. And whether that's for the servicemen that are from the U.S. or servicemen that are visiting here, being trained, or whether it is for the very expensive equipment, that is the highest policy. And recently, the Ninth Circuit in Childs v. San Diego Housing in January 2022 just said that there is no substantial public policy infringed upon to put a government contractor to trial. I can provide you with that site later, but it's a very recent case which is not addressing these issues, but is addressing the issue of appealability. Ms. Huarte? Yes. I'll give you some extra time for rebuttal because we've been asking a lot of questions. I have just one minor question I wanted to ask you about. When you were answering the initial question from Judge Watford, it reminded me when I was looking over the summary judgment record about the forms where they signed his completion of the training tasks. And there are a series of forms sort of around ER 675, 676. And there was one that had caught my eye on page 676, which maybe you could help. And I gather your point is that with respect to all these forms, they raise a tribal issue of fact as to really what the nature of the training was. Is that what your point was? Because on this one form, it says system munitions lift truck training part one. And then it goes on to say, familiarize with the principle of operation and participate satisfactorily in performing the following tasks. The fourth task is operating and driving of the lift truck. And Judge Watford had asked you what record in the evidence is there that would show that the trainer, I forget what his name is, had any, you know, that there was information that suggested that he didn't have sufficient training. But somebody who is familiar with these records might well suggest that he knew how to operate and drive the lift truck. So what do we do with these forms? How do they fit into this? Yes, I think you're referring to page 676. And there's a phrase, quote unquote, operating and driving. Yes. But the familiarization training record by the Singapore Air Force does not detail what that means. Well, and participate, it says, it goes on to say and participate satisfactorily in performing the following tasks. Yes, and the task does not list driving it on a road or at any higher speed. And it specifically says he didn't test for braking. And the car specifically gives him a restriction of ramp only. Where is that? At page 679 and page 680. His certification was limited. At minimum, we know that the trainers or instructors, Mr. Young and Mr. Wright, had to review the card and they should have seen that restriction. And that presents a tribal question of fact, whether or not he was even allowed to drive on the flight line road. Let alone competent to do it. Okay. All right. Okay, thank you. Let's hear from the other side and I'll give you some time for rebuttal. Thank you. Good morning, Justices. I don't know where to look. I guess I go over, go back and forth. May it please the Court. My name is Neil Tardif of the law firm of Ford, Walker, Haggerty, and Behar. And I, along with my colleagues, Jeffrey Behar, Tina Mangarpen, and Catherine Harwood, represent the Appalee PKL Services, Inc. The California Supreme Court in the landmark case of Dillon v. Legge at 68 Cal Second, 728, made it clear that not every defendant owes a duty of care to the plaintiff. And this is one of those cases. As this Court has already pointed out, under these unique circumstances, we're dealing with an injury arising out of a military cooperation agreement between the United States and Singapore, while carrying out a confidential military combat operation of the Republic of Singapore Air Force in the training setting under very strict United States Air Force specifications. And therefore, PKL owed no duty of care to the plaintiff arising out of the driving of a jammer down an Air Force road. The district court held, and the evidence supported the finding, that driving this jammer down a road is not inherently dangerous. PKL did nothing to create the alleged peril. And PKL had no... Well, I guess, let me just dispute that statement there. It does seem to me the plaintiff's expert's declaration suggests that there is definitely inherent danger in entrusting the jammer, let's just call it the jammer, the MJ-1, to somebody who doesn't know how to operate it on an open road, precisely because it's so difficult to maneuver, especially if you get it up to speed. So I guess I view the case differently from you on that front. Are you having a hard time hearing me? A little bit, but I think it's me, not you. Okay, I can only... I'll try to keep my voice down. It's called age. So, I mean, I guess I do view the vehicle itself as potentially inherently dangerous when entrusted to someone who doesn't have adequate training on how to operate it, because it's not just like driving a car. You know, at 10 miles an hour, yeah, you would think if you have a driver's license, sure, that person is going to be competent to drive it, you know, a half mile down the road. This thing is very different. And so that's why I was asking the questions about what evidence suggested that your client should have known that somebody with the plaintiff's limited training really would not be able to, sorry, I just was getting a message from my computer, you know, would not know how to operate the jammer out on the open road. And so can you speak to that? Because at the very end of your opponent's argument, she's pointed to some records that suggested that maybe the certification was very limited in terms of what the plaintiff knew how to do with that vehicle. Well, if you look at the record, at ER 673 to 680, any reasonable person looking at that would think that the soldier was completely trained in the operation of the jammer. I mean, the specifications make it clear, the United States Air Force makes it clear that no soldier, not even a U.S. Air Force soldier, can get on that flight line without knowing how to operate and be certified with these vehicles. I mean, surely I couldn't drive one of those and you couldn't drive one of those. And from looking at these training records, you can only assume that they learned all aspects of driving the jammer. There's absolutely nothing in there that would indicate they only drove it in a 15-foot circle. It's Soldier Tan who says that in his declaration, but there's absolutely no evidence that PKL knew what was in Mr. Tan's head. And, you know, Mr. Wright testified that, you know, we rely on the Republic of Singapore to train these people properly, and then we rely on the United States Air Force to make sure and confirm that they've been trained properly. And if you look at these records, I mean, it's like for the braking, no braking testing, that's just not true. When you look at this, the NA, where they marked NA for braking, that had to do with a completely different vehicle. It had nothing to do with the jammer. And if you look at these records, the soldier not only had academic training from the Singapore government going through the operation of the jammer and how it operated and everything else, and then they had driving tests that they were given during the day and during the night, and knowing how to operate with these levers. And that's all it shows here. I mean, that's, and so the entire indication from this record, and Mr. Wright's testimony, is that the Singapore government trained these people properly on how to use the jammer. If Mr. Tan was not trained properly, as he purports in his declaration, how could we know that when we're all, when everybody's moving these vehicles over to the squadron building and other places? Just one form that you've, that we had a discussion with council on page 679. What, it says restricted ramp only, restrictions ramp only. What does that mean? I'm sorry, Justice, I'm, I have 679. You can just call me Judge. I, you know, I never really quite made it beyond my current position, which is just fine with me. So you can. I'm sorry, Judge. Okay, that's great. I'm more accustomed to Judge than. I have it in front of me. At least on my, on my version of it, there's a checkmark. It says, check all applicable restrictions and or special access, whatever that means. Then on, right below it, it says ramp only, and I have a line right next to ramp only. Oh, I see what you're saying. And then there's daylight hours, there's nothing. CMM, CMA access, there's nothing. Other specifying, there's nothing. I can't tell you what that means, but I would refer you up to number six, seven, and eight, which says that he received practical day familiarizing driving it, practical night driving, and then practical driving test day and night. So I think anybody would assume that he was given training on the jammer. And this is all about the jammer, is that right? Yes, Your Honor. Okay. And getting back to the policy of Rowland versus Christian, I would agree with this court that this is different than the Lube II case, which is the police case that was referenced by Judge Bennett, that case is just one of a line of cases that deal with law enforcement and how they treat the public when they're pulling them over for a traffic violation or anything. It's totally distinguishable from this case. And the other case that was cited at length was Cabral, which says you have to categorize the duty when you're analyzing this duty, and the category here is not just a trainer teaching a trainee. This is a, not only a military contract, but it's a military contract between two governments where they're training for combat operations. I mean, and if you look at the record down at the bottom, all these specifications and Air Force instructions and policies, they're all confidential. And so this is a really unique case. It's not just a typical military contract, you know, where they're hiring somebody to go store fireworks somewhere. This is combat operation. And to, for even, for the state courts to get involved, there's surely a policy against that. But even for these courts to say there's a duty under those, we're second-guessing the military and how they handle combat. And picking up on that, clearly the matter, we really do have to get to the meat of it, don't we, in that sense, because the notion of perhaps derivative sovereign immunity for your client is a little bit of a stretch in that derivative immunity is really a narrow doctrine. I think we all recognize that. And it applies only when a contractor has no discretion in terms of how training should be conducted. It's clear that your client did have discretion in terms of, for example, how to clear the hangar in preparation for an event. The hangar was being cleared for an event that was to take place in the hangar, correct? Yes, sir. So to that extent, your client did have discretion in terms of how the hangar was to be cleared. So we really can't just dodge this issue by derivative sovereign immunity. I think we really do have to get into the meat of the matter of a duty and how you define the duty and whether or not this case can be analysed to standards of police departments, for example. Well, getting to, I was going to get on to the discretionary issue, this clearing of the hangar is so ancillary to the contract between PLK and the United States Air Force. I mean, PLK's duties under the contract were to provide ammunition loading. And that was their job. This changing of the, moving the equipment out of the hangar was more akin to putting the equipment back in its place at the end of the day. This was such a small, minor part of, you know, a huge, huge combat contract. And because you get a picture of this hangar, it has, the testimony was that there was U.S. Air Force planes in there as well, as well as U.S. Air Force soldiers. And that the Republic of Singapore had this little tiny spot in this hangar. So everything had to be cleared out that day. And they were just clearing it out. But really, it's just so ancillary. Of course, they, I mean, I'd have to concede that they had some discretion in moving this stuff out. But you're dealing with multi-million dollar pieces of equipment. So you have to be, you have to follow the specifications as to how you're going to move those kind of things. And the equipment was Singapore's equipment as well. And we can't lose sight of that. And so it was a teamwork thing to just move these things. But it was just such a small part of the contract. It's so ancillary that even under sovereign immunity, I don't think the discretion is applicable here. Because you have to look at what was really the contract between P.K.L.A. and the United States government, which was... But in fairness to Mr. Tan, the fact that it's ancillary means that your client did retain some discretion as to the method in which that was to be conducted. So it might seem inviting to hide out under the doctrine of derivative sovereign immunity. I'm smiling here. I'm not really sure the court has that luxury. I think we will have to get to the meat of it. But even if we go look at the duty issue, you have to, you know, the real issue is, did P.K.L. create some peril to the plaintiff when they were moving those things? And P.K.L. had absolutely no knowledge that he was not trained in this. And Mr. Tan surely didn't tell any of us. And an appellant argues that the court weighed the evidence and all that when he was addressing what was in Mr. Tan's head. But no, the district court was addressing foreseeability. He's looking into the mind of P.K.L. and what did they know when we were moving things? And they assumed that he was properly trained in the jammer. And they was just going down the road. And these things only go 10 miles an hour. And they've been tested to go down the road adequately. And the evidence shows that. And so there's no evidence that P.K.L. increased any kind of risk to the plaintiff that caused these injuries. And if I could just touch on the derivative liability, in the Campbell-Ewald case, I think in my opinion, this is a yearsly case. And maybe before the U.S. Supreme Court talked about it, ruled in Campbell-Ewald, I might have even agreed that it was limited to public works, as this court has on many cases prior to that. But in footnote 7 of the Campbell case, they noted they actually disagreed with some of this court's opinion in the Gomez case that the Ninth Circuit ruled on. And other cases where they said it disagreed with the court's narrow interpretation of yearsly, stating that the critical analysis is that the contractor's performance was in compliance with the government's directive. And in this case, P.L.K. was in compliance with the government's directive. It's undisputed. And it's ammunition loading training, which it was hired to do. And it's so different than the Cabalt's case, where they had complete discretion to move the fireworks. I think this court in the Childs case, I think, this year in 2022, commented upon, I think, a narrower interpretation of Campbell, you would agree, the Ninth Circuit and Childs v. Cindy. This court has given a little bit more narrow definition in terms of the matter of derivative sovereign immunity. But I would ask this court to look at footnote 7 of the U.S. Supreme Court actually addressing the Ninth Circuit opinion on that. So I'm sure the Supreme Court was very supportive of the Ninth Circuit. I'm sure. I'm sure the Supreme Court was very supportive of the Ninth Circuit. Oh, I'm sure. We have the law courts in the courtroom shuffling at that. It was a nice footnote. You're not basing your argument on the similarity between the Supreme Court and the Ninth Circuit on these matters, I assume, are you? No, I'm not. I'm just laughing. Thank you. Counsel, you should wrap it up because you're over your time. You know, really what Appellant is attempting to do here is hold P.K.L. liable derivatively for the alleged negligent training of the Republic of Singapore. And there's no authority supporting such a contention. There's no evidence supporting such a conclusion. It's undisputed that the Singapore soldiers were trained in the operation of the jammer, and the U.S. Air Force confirmed that they were properly trained and that P.K.L. had nothing to do with this training. And I think under the Rowan v. Christian analysis, it would be against public policy to interfere with this combat operation and hold P.K.L. to have a duty in this situation. Okay. Thank you, Counsel. Thank you so much. Blanca, let's put three minutes on the clock for this wartime. Thank you for that time. I would like to return to two of the issues that were raised toward the end of my time previously. That this is a military context, and we do not want to infringe upon contracts between governments. I put to you that emptying the hangar safely is in line with public policy, both of the Air Force, the Singapore Air Force, and of general public policy, whether under California or Idaho, but mainly under the U.S. Air Force's contract called the P.W.S., or Performance Work Statement, and also primarily under the Air Force instruction. Both of those explicitly put a priority on safety. And this safety that I'm advocating about clearing the hangar has nothing to do with loading weapons. So it does not infringe upon any of the instructions, the military specifications, for performing— Lost Judge Watford. Hold on. We just lost Judge Watford. Kelly, you there? Hold on. Kelly? Okay. Okay. You said Judge Watford should be hooking back on. Okay. Hi, Judge Pius. This is Kelly. Judge Watford has disappeared from the call, so I'm waiting for him to reconnect to the call. Okay. We'll stand by. Blanca, you may wish to call Judge. Okay. Here's Judge. Okay. Here's Judge Watford. Yes, I'm sorry about that, Mike. That's okay. Technology. Go ahead. You might want to just— Reiterate the point. I was—I'm not sure where you had to leave, but I was discussing that emptying the hangar safely is in line with Air Force policy and all the other policies, right? Public policy, let's say. And that clearing the hangar had nothing to do with weapons loading training. So therefore, us asking for safety during this post-training direction does not and cannot infringe upon the government contract nor the Air Force instructions. In the military context, a duty of care by a government contractor is still owed to a service person. And as your honors were discussing, it is a limited—it's limited to when derivative sovereign immunity will be granted. And the precedent for the duty of care is not only the police officer case Lube II, it's also other cases like Patterson, where the junior college instructor owed a duty to a trainee not to send him to do something that carried a foreseeable risk of injury. Moving on from why this would not infringe upon government's contracts—government's contracts, yes—another question that has been discussed extensively is why should the instructors not assume TAM was competent to drive the road? I just want to remind the court that on page 674 of the record, the, quote-unquote, munition lift truck competency test has items one through eight, and that is what the Republic of Singapore Air Force was tasked to teach. None of those items includes driving the MJ-1 on the road or at any higher speed. It did train to operate the vehicle in small maneuvers. Okay. Okay. You're beyond your three minutes, so thank you, counsel. Thank you. We appreciate both arguments this morning. Thank you very much. The case is now submitted for decision. Thank you. That ends our session for today. Thank you.
judges: PAEZ, WATFORD, Bennett